# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Civil Action No. 1:25-cv-00225-SWS

**MENDOCINO RAILWAY, a California corporation,**

Plaintiff,

v.

**HOPPER METALS, INC., a Wyoming corporation, and ~~Michael Dimick~~MICHAEL DIMICK, an individual**

Defendants.

---

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Mendocino Railway (“Mendocino~~”),~~”) through its attorneys, Hall & Evans, LLC, complains, states and alleges against Defendants Hopper Metals, Inc. and Michael Dimick, as follows:

**PARTIES**

1. Plaintiff ~~Mendocino Railway (“Mendocino” or “Plaintiff”)~~ is a California corporation with its principal place of business located at ~~1655 Da Vinci Court, Davis~~100 West Laurel Street, Fort Bragg, California ~~95618, and authorized to transact business in the State of Wyoming~~95437.

2. Defendant Hopper Metals, Inc. (“Hopper”) is a Wyoming corporation, with a principal place of business located at 405 1st St., Shoshoni, Wyoming, 82649, and authorized to transact business in the State of Wyoming.

3. Defendant Michael Dimick (“Mr. Dimick”) is an individual and a resident of the State of Wyoming. Upon information and belief, Mr. Dimick resides at 622 Burma Road, Riverton, Wyoming, 82501.

**JURISDICTION AND VENUE**

Style Definition: Heading 3: Left
Style Definition: Heading 4: Left
Style Definition: Heading 5: Left
Style Definition: Heading 8: Left
Style Definition: Body Text Indent: Left
Style Definition: Body Text 2: Left
Style Definition: Block Text: Left
Style Definition: Body Text Indent 2: Left
Style Definition: Footnote Text: Left
Style Definition: DC ADDRESS: Left
Style Definition: Default: Adjust space between Latin and Asian text, Adjust space between Asian text and numbers
Style Definition: Revision
Formatted: Adjust space between Latin and Asian text, Adjust space between Asian text and numbers
Formatted
Formatted: Left, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers
Formatted
Formatted
Formatted
Formatted: Left
Formatted: Font color: Black
Formatted: Justified
Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Justified

4. Jurisdiction is proper in this Court based upon diversity jurisdiction under 28 U.S.C. §§ 1441, 1446, and 1332, as federal courts have diversity jurisdiction in lawsuits between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332.

5. Venue is proper in this Court because the tortious actions of Defendants occurred in the Federal District of Wyoming, and because Hopper is incorporated and headquartered in Wyoming and Mr. Dimick is a resident of Wyoming.

**GENERAL ALLEGATIONS**

6. Mendocino is a railroad company that is in the business of operating trains and railway cars.

7. Hopper is a scrapyard company that is in the business of selling scrap metals including aluminum and steel.

8. Mr. Dimick is the president of Hopper.

9. This case arises out of Mr. Dimick and Hopper's ~~conversion~~unauthorized taking, sale, and retention of Mendocino's property – valuable scrap metal from railcars ~~—~~ – that ~~were~~was being used for a project in Shoshoni, Wyoming.

10. In spring 2021, Mendocino purchased sixty (60) former coal railcars from MRD Group, Inc. for use in a new passenger train called the "Iron Sherpa" which it intended to operate in California.

11. In May of 2021, Mendocino entered into a *Railcar Construction Agreement* (hereinafter the "Agreement") with Wasatch Railroad Contractors ("WRC") for the purpose of modifying fifty (50) of Mendocino's recently purchased coal railcars into passenger hotel cars for use on the Iron Sherpa train.

12. The Agreement provided that WRC was to dismantle most of the railcars' bodywork before beginning to construct new car bodies for their use as hotel cars.

13. The Agreement also ~~called for~~ provided that WRC was to ~~sell any~~ scrap ~~metal or components taken from~~ unusable portions of the railcars, apply the proceeds from scrapping toward WRC's scrapping and ~~to use those proceeds to offset the cost of constructing the new hotel cars, and provided that if the scrap's value exceeded the contract price, any overage would be paid~~construction costs, pay any excess proceeds to Mendocino, and stack and store the remaining portions on WRC's property until needed for construction, readied for return to Mendocino, or further scrapped or sold at Mendocino's request.

DRAFT

**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Justified
**Formatted:** Font color: Auto
**Formatted:** Font color: Auto
**Formatted:** Font color: Auto
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Font color: Auto
**Formatted:** Font color: Auto
**Formatted:** Font color: Auto
**Formatted:** Font color: Auto
**Formatted:** Justified

14. The Agreement thus contemplated that (a) the scrap metal and equipment from Mendocino's railcars had value; (b) WRC would scrap and ~~(b)~~ sell scrap metal only as authorized by the Agreement; (c) Mendocino would be entitled to the proceeds of any authorized sale, including any overage after offsets required by the Agreement; and (d) Mendocino would retain ownership ~~over~~of, and the right to possess, any scrap metal and equipment from those cars ~~until it was~~that had not been scrapped or sold ~~and~~by WRC as authorized by the ~~proceeds remitted to Mendocino~~Agreement.

15. Fifty (50) of Mendocino's coal cars were subsequently transported to Shoshoni, Wyoming for WRC to begin the process of dismantling the railcars to remove the valuable metal siding and other components so that the flat bases of the cars could be used to build hotel cars upon.

16. WRC commenced with dismantling and scrapping the railcars.

17. In the late summer and early fall of 2021, WRC, acting on behalf of Mendocino, began negotiations with various scrapyard and recycling companies to sell Mendocino's disassembled scrap metal.

18. One of the companies WRC negotiated with was Hopper, through Mr. Dimick.

19. WRC and Hopper discussed terms under which Hopper, upon receipt of authorized loads of scrap metal, would pay the market value price per pound of aluminum and steel for approximately ten cars' worth of scrap metal per load, minus costs for delivery and cleaning.

20. The coal cars contained approximately 3,200 pounds of 6000 series aluminum, 3,800 pounds of 5000 series aluminum, and 4,000 pounds of steel.

21. After delivery and cleaning, the estimated value of the scrap metal contained in each individual car was between $4,500 and $5,000, with each total load (10 cars) being worth approximately $45,000 to $50,000.

22. Following those discussions, Hopper picked up the first load of scrap metal.

23. Hopper received that first load (hereinafter the "First Load") through WRC's authorized first-load sale process and subsequently sold it.

24. Before issuing payment, however, Mr. Dimick told WRC that he would not be issuing full payment for the First Load as initially agreed because WRC allegedly owed Hopper money regarding an unrelated transaction.

25. WRC, through its proprietor John Rimmasch, informed Mr. Dimick and Hopper that the scrap metal in the First Load belonged to Mendocino and not WRC, that this scrap metal

**Formatted:** Justified, Indent: Left: 0"

**Formatted:** Justified

**Formatted:** Justified, Indent: Left: 0"

**Formatted:** Justified

DRAFT

was not WRC's property, and that as a result, the First Load sale proceeds could not be used to offset WRC's debts.

26. Mr. Dimick nonetheless refused to remit the full amount of the proceeds from the sale of the First Load of scrap metal despite being told that this scrap metal was Mendocino's property and that proceeds attributable to Mendocino's scrap metal could not be used to satisfy a debt owed to Hopper by WRC.

27. Additionally, Mr. Dimick refused to pay the agreed-upon price per pound of scrap metal for the First Load he took and instead offered to pay $2,800 per car, slightly over one-half of the agreed-upon price.

28. WRC responded that $2,800 per car would not be accepted, and WRC did not authorize Hopper to pick up any more loads of scrap.

29. After Hopper took the First Load, a substantial amount of scrap metal from Mendocino's railcars (hereinafter the "Remaining Scrap Metal") remained at WRC's yard

30. Mr. However, Dimick later told WRC that he had issued a check as partial payment for the First Load, but WRC refused to accept the payment because the amount wrongfully incorporated the disputed offset and was based on a per-pound rate lower than what was agreed upon.

31. After several unsuccessful attempts to contact Mr. Dimick regarding full payment for the First Load of scrap metal, WRC contacted the Shoshoni, Wyoming Police Department, and Mendocino provided information, on or about November 8, 2021, to report the nonpayment and apparent unauthorized taking of Mendocino's Remaining Scrap Metal by Hopper and/or Mr. Dimick. The Shoshoni Wyoming Police Department referred the matter to the Fremont County Sheriff's Department ("FCSD") on or about November 9, 2021, with the matter being identified as Case No. C21-06584.

17.32. During FCSD's investigation and before the project WRC's reconstruction of the railcars per the Agreement could be completed, WRC experienced financial difficulties and, halted theirits work on the project. , and closed its yard.

33. WRC filed for bankruptcy in September 2021, and, in a pleading filed by Hopper and Mr. Dimick in objection to dismissal of the bankruptcy (attached here as **Exhibit 1**), Hopper and Mr. Dimick represented as follows:

a. Hopper and Mr. Dimick claimed that a verbal agreement was made to purchase approximately 50-120 rail cars for scrap metal recycling, and that the anticipated purchase price was .225-.245 per pound.

Formatted: Font color: Black

Formatted: Justified, Indent: Left: 0"

Formatted: Bullets and Numbering

b. Hopper acknowledged receipt of approximately 160,000 pounds of mixed metals from WRC, with actual weight to be scaled as materials were prepared for shipment.

c. According to Hopper and Mr. Dimick's filing, Hopper enclosed a check totaling $14,200.00 payable to WRC, calculated by acknowledging 160,000 pounds at a market price of .245 per pound ($39,200) and then applying a claimed offset for a previous debt, in excess of $25,000, allegedly owed by WRC to Hopper.

34. The mixed metals referenced in Hopper's bankruptcy filing included scrap metal from Mendocino's railcars, and neither WRC nor Plaintiff received full compensation for that scrap metal.

35. At the time WRC closed its yard, the Remaining Scrap Metal from Mendocino's disassembled coal cars remained on WRC's land.

36. On or about December 2, 2021, Mr. Dimick spoke with Detective Granlund of the Fremont County Sheriff's Office.

37. According to Det. Granlund's report, Mr. Dimick stated that over the course of approximately a year, he had taken and sold approximately 150,000 pounds of scrap metal from Mendocino's railcars.

38. The 150,000 pounds of scrap Mr. Dimick admitted to taking and selling was substantially in excess of the weight of the First Load.

~~18.~~39. On May 4, 2022, Robert Pinoli, President of Mendocino, visited Shoshoni, Wyoming, to investigate the status of ~~the~~Mendocino's railcars and ~~missing Subject Property~~the Remaining Scrap Metal.

~~19.~~40. On ~~said date~~May 4, 2022, Mr. Pinoli met with Dave Nelson, President of Bighorn Divide & Wyoming Railroad, which had leased ~~property~~land to WRC for its operations.

~~20. While on site, Mr. Pinoli identified and accounted for portions of all fifty (50) of Plaintiff Mendocino's railway cars in various states of disassembly.~~

~~21. Although he identified portions of Mendocino's cars, Mr. Pinoli observed that a large quantity of the scrap metal and equipment from the disassembled cars (the "Subject Property") was not present at the former WRC site.~~

~~22.~~41. Based on Mr. Pinoli's observations at the scene, and upon information and belief, ~~the value of the missing Subject Property~~a substantial amount of scrap metal from Mendocino's railroad cars was missing from the land leased by WRC, the value of which was approximately $189,960 in aluminum ~~and~~scrap plus an additional $38,500 in steel scrap.

Formatted: List Paragraph, Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Bullets and Numbering
Formatted: Bullets and Numbering
Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Bullets and Numbering
Formatted: Justified

DRAFT

42. Mendocino subsequently WRC's proprietor John Rimmasch informed Mendocino that Hopper was the scrap metal company WRC had used to begin scrapping the rail cars; that Hopper and/or Mr. Dimick took the First Load and would pay for it per the terms of their agreement with WRC; that Hopper and/or Mr. Dimick refused to pay the agreed-upon amount for the First Load and instead offered a reduced rate which WRC refused to accept; that WRC told Hopper and Mr. Dimick that the scrap metal belonged to Mendocino and could not be used to satisfy WRC's debts; and that Hopper and/or Mr. Dimick were never authorized to take the Remaining Scrap Metal from WRC's land.

43. Upon on information and belief, Hopper and/or Mr. Dimick – without authorization from WRC or Mendocino – entered WRC's land, took the Remaining Scrap Metal from Mendocino's railroad cars, sold it to a scrap yard in Utah, and kept the proceeds.

44. Mendocino bases the above allegation on the following facts alleged above: Hopper's authorized pickup and sale of the First Load through WRC's sale process; Mr. Dimick's subsequent refusal to pay the agreed price for First Load; WRC's express refusal to authorize Hopper to pick up additional loads from the Remaining Scrap Metal; Mr. Pinoli's written notice to WRC that Mendocino had no agreement for its property to be at Hopper Metals, no agreement with WRC to sell the scrap, and no apparent agreement between WRC and Hopper other than the scrap being there; Mr. Rimmasch's written statement that Hopper and/or Mr. Dimick took the First Load and would pay for it per the terms of their agreement with WRC; that Hopper and/or Mr. Dimick refused to pay the agreed-upon amount for the First Load and instead offered a reduced rate which WRC refused to accept; that WRC told Hopper and Mr. Dimick that the scrap metal belonged to Mendocino and could not be used to satisfy WRC's debts; and that Hopper and/or Mr. Dimick were never authorized to take the Remaining Scrap Metal from WRC's land; WRC's later closure of its yard; Mr. Pinoli's May 4, 2022 inspection showing that the Remaining Scrap Metal was missing; Mr. Rimmasch's statement to Mendocino; Mr. Dimick's statement to Detective Granlund that he had taken approximately 150,000 pounds of scrap metal from Mendocino's railcars; Hopper and Mr. Dimick's bankruptcy filing describing receipt of 160,000 pounds of mixed metals and a disputed offset; and Hopper and Mr. Dimick's nonreturn of the Remaining Scrap Metal, nonpayment of its value, and retention of any sale proceeds.

23. Mendocino first learned that the missing Subject Property had been transferred to Hopper and/or Mr. Dimick sometime in the fall of 2021.

24.45. Mendocino first learned that Hopper and Mr. Dimick were wrongly exercising possession over the Subject Propertyor control, without authorization, over Mendocino's Remaining Scrap Metal or proceeds from any sale of same less than four (4) years from the date of this suit.

25. Mendocino subsequently demanded to Mr. Dimick that Hopper return the missing Subject Property or provide monetary compensation for same.

**Formatted:** Justified, Indent: Left: 0"

**Formatted:** Bullets and Numbering

**Formatted:** Justified

46. Less than four (4) years from the date of this suit, ~~Mr.~~ Mendocino made demand upon Mr. Dimick and Hopper for the return of Mendocino's property, or full compensation for the same, however Mr. Dimick and Hopper refused to either return Mendocino's Remaining Scrap Metal or to provide ~~Plaintiff~~ Mendocino with ~~its missing Subject Property and refused to provide~~ any compensation for the same, including the fair market value of the Remaining Scrap Metal at the time it was taken if return is unavailable.

47. To this date, neither WRC nor Mendocino has received either the return of, or monetary compensation for, Mendocino's Remaining Scrap Metal taken by Hopper and/or Mr. Dimick.

~~26.~~48. Further, to date, Defendants have failed to pay Mendocino for the First Load in the amount required by their agreement with WRC.

**FIRST CLAIM FOR RELIEF**
**(Conversion Against ~~Defendants~~ Hopper and Mr. Dimick)**

~~27.~~49. Plaintiff ~~Mendocino~~ hereby incorporates by reference the preceding paragraphs above as though fully set forth herein.

~~28.~~50. At all times relevant, ~~Plaintiff~~ Mendocino had legal title and the immediate right to possess the ~~Subject Property~~Remaining Scrap Metal from its railcars that was not part of the First Load Hopper picked up under the WRC-Hopper arrangement. If Defendants sold the Remaining Scrap Metal, Mendocino is entitled to return of the Remaining Scrap Metal if available, or to recover its fair market value at the time of the unauthorized taking or conversion and any proceeds Defendants received from the unauthorized sale.

51. After the dispute arose over the First Load, Defendants, without consent of WRC or Mendocino, wrongfully and unlawfully took the Remaining Scrap Metal from WRC's land, and thereby wrongfully converted it for Defendants' own benefit and use.

52. At the time Defendants Hopper and Mr. Dimick wrongfully and without authorization took the Remaining Scrap Metal, they knew, or reasonably should have known, that they did not have legal title or authorization from WRC or Mendocino to take control of and sell the Remaining Scrap Metal.

53. At all times relevant~~, Defendant Hopper and~~ to Defendants' unauthorized taking of the Remaining Scrap Metal, Mendocino had legal title to, and the immediate right to possess, the Remaining Scrap Metal.

54. As background, Defendants Hopper and Mr. Dimick obtained the First Load of scrap metal through WRC's authorized sale process, but refused to pay the full agreed-upon amount for that load after claiming an offset for a separate WRC debt.

**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Bullets and Numbering
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Bullets and Numbering
**Formatted:** Justified
**Formatted:** Justified, Indent: Left: 0"
**Formatted:** Bullets and Numbering
**Formatted:** List Paragraph, Justified, Indent: Left: 0"

DRAFT

55. Mendocino alleges the First Load nonpayment and offset facts as background and, where applicable, as part of its alternative unjust-enrichment, money-had-and-received, accounting, constructive-trust, equitable-lien, and proceeds theories.

56. Separately, and in the alternative, Defendants obtained the First Load of scrap metal with WRC's consent but failed to pay the agreed amount for it; to the extent that theory sounds in conversion at all, Plaintiff alleges it only in the alternative and only to the extent legally available, and otherwise as an alternative proceeds theory based on Defendants' retention of sale proceeds that equity and the WRC-Hopper arrangement required to be paid for Mendocino's benefit.

57. Plaintiff's conversion claim primarily alleges that Defendants Hopper and Mr. Dimick wrongfully and unlawfully took the Remaining Scrap Metal from WRC's land, without authorization from WRC or Mendocino, despite knowing or reasonably having reason to know that Mendocino had a right to possess the Remaining Scrap Metal at the time they took it.

58. Defendants Hopper and Mr. Dimick never had legal title or the right to possess the Remaining Scrap Metal.

59. At all times relevant, Defendants Hopper and Mr. ~~Mr.~~ Dimick exercised control or dominion over the ~~Subject Property and by refusing to return the Subject Property to Plaintiff, thereby~~ Remaining Scrap Metal by entering WRC's land and taking the Remaining Scrap Metal without authorization to do so.

Formatted: Font color: Black

~~29.~~60. By taking the Remaining Scrap Metal, Defendants Hopper and Mr. Dimick denied ~~Plaintiff its~~ Mendocino's right to use and enjoy the ~~Subject Property.~~benefits of the Remaining Scrap Metal by refusing to return the Remaining Scrap Metal to Mendocino, selling the Remaining Scrap Metal, keeping any proceeds from the sale of same, and refusing to provide monetary compensation for the Remaining Scrap Metal, including its fair market value at the time of conversion or unauthorized taking if return is unavailable.

Formatted: Justified, Indent: Left: 0"

Formatted: Bullets and Numbering

Formatted: Justified

~~30. Defendants Mr. Dimick and Hopper also refused Plaintiff Mendocino's demand for return of the Subject Property after Plaintiff informed it that the Subject Property belonged to Plaintiff.~~

61. ~~Plaintiff~~ Mendocino has suffered damages by the loss of the ~~Subject Property~~Remaining Scrap Metal and Defendants' refusal to return it or fairly compensate ~~Plaintiff for it~~Mendocino for it, including the fair market value of the Remaining Scrap Metal at the time of conversion or unauthorized taking, restitution or disgorgement of any proceeds Defendants received, pre- and post-judgment interest, and other relief available at law or in equity.

**SECOND CLAIM FOR RELIEF**
**(Unjust Enrichment Against Hopper and Mr. Dimick)**

62. Plaintiff hereby incorporates by reference the preceding paragraphs above as though fully set forth herein.

63. Defendants Hopper and Mr. Dimick obtained Mendocino's Remaining Scrap Metal without authorization, estimated to be worth $228,460 or more, and, in the alternative, retained proceeds or a windfall from the sale of the First Load that should have been paid for Mendocino's benefit.

64. By receiving the First Load, selling it, and not paying Mendocino for it, Defendants received a benefit.

65. By wrongfully taking the Remaining Scrap Metal and refusing to return it, Defendants also received a benefit.

66. Defendants Hopper and Mr. Dimick took and sold Mendocino's Remaining Scrap Metal without the authority to do so and knowing, or reasonably having reason to know, that legal title and the immediate right to possess the Remaining Scrap Metal belonged to Mendocino, and that Defendants were not authorized to take, possess or sell the Remaining Scrap Metal.

67. Mendocino timely demanded Defendants Hopper and Mr. Dimick return Mendocino's Remaining Scrap Metal or to provide monetary compensation for the same.

68. Defendants Hopper and Mr. Dimick refused to return the Remaining Scrap Metal to Mendocino or to provide monetary compensation for the same.

69. Defendants Hopper and Mr. Dimick will be unjustly enriched to the detriment of Mendocino if they are permitted to retain Mendocino's Remaining Scrap Metal, retain the fair market value of the Remaining Scrap metal, or retain the proceeds from their unauthorized taking and sale of Mendocino's Remaining Scrap Metal, including, in the alternative, any proceeds from the First Load that should have been paid for Mendocino's benefit rather than retained or offset against a separate WRC debt.

70. In the alternative, Defendants Hopper and Mr. Dimick have received money – both in the sale of the First Load and their wrongful taking and sale of the Remaining Scrap Metal – that in equity and good conscience belongs to Mendocino, and Mendocino is entitled to recover those amounts under a theory of money had and received.

71. In the alternative, because Defendants obtained and retained proceeds traceable to Mendocino's railcar scrap, Mendocino is entitled to imposition of a constructive trust and/or equitable lien over those proceeds, including any identifiable funds, assets, or profits derived from the sale of Mendocino's scrap metal.

~~31.~~72. In the alternative, Defendants Hopper and Mr. Dimick possess information concerning the amounts, weights, sale prices, buyers, offsets, costs, and proceeds associated with

**Formatted:** Justified, Indent: Left: 0"

**Formatted:** Bullets and Numbering

DRAFT

Mendocino's scrap metal, and Mendocino is entitled to an accounting of all such transactions and proceeds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mendocino Railway prays for relief and requests the Court enter judgment in its favor as follows:

1. For Plaintiffreturn of Mendocino's Remaining Scrap Metal, if available, or, if return is unavailable, the fair market value of the Remaining Scrap Metal at the time of conversion or unauthorized taking;

2. For Plaintiff's actual damages, restitution, disgorgement of proceeds, money had and received, including any First Load proceeds or first-load shortfall that should have been paid for Mendocino's benefit,

1.3. An accounting, imposition of a constructive trust and/or equitable lien over identifiable proceeds or traceable assets, costs of suit, fees of experts, attorney fees, pre-judgment interest as permitted by law from the date of occurrence to the date of entry of judgment, as well as post-judgment interest until paid; and

2.4. For such other and further relief as the Court deems just and proper.

**JURY DEMAND**

**PLAINTIFF MENDOCINO DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**
**ON ALL ISSUES SO TRIABLE.**

Dated this 7th___ day of November, 2025June, 2026.

Respectfully Submitted,

By: */s/ Andrew Reitman*________________
Andrew P. Reitman, #7-5946
HALL & EVANS, LLC
1001 Seventeenth Street, Suite 300
Denver, Colorado 80202
(303) 628-3300
reitmana@hallevans.com
ATTORNEYSreitmana@hallevans.com
ATTORNEYS FOR PLAINTIFFPLAINTIFF
MENDOCINO RAILWAY



Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Bullets and Numbering
Formatted: Justified
Formatted: Justified, Indent: Left: 0"
Formatted: Bullets and Numbering
Formatted: Justified